Bruce **GOONAN**, Plaintiff,

v.

**FEDERAL RESERVE BANK OF
NEW YORK**, Defendant.

No. 12 Civ. 3859(JPO).

United States District Court,
S.D. New York.

Jan. 7, 2013.

Valdi Licul, Lara Rose Corchado, Vladeck, Waldman, Elias & Engelhard, P.C., New York, NY, for Plaintiff.

Katherine Rosemary Steele Landy, Davis Polk & Wardwell L.L.P., New York, NY, for Defendant.

## MEMORANDUM AND ORDER

J. PAUL OETKEN, District Judge.

The Federal Reserve Bank of New York ("the Fed") has filed a motion to dismiss the First Amended Complaint ("Compl.") filed by Bruce Goonan ("Plaintiff"). Plaintiff alleges discrimination and retaliation under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, the New York State Human Rights Law, Executive Law § 290 *et seq.*, and the Administrative Code of the City of New York, § 8–101 *et seq.* The Fed has moved to dismiss Plaintiff's claims on the ground that it offered him reasonable accommodations and Plaintiff subsequently caused a breakdown in the interactive process. The Fed argues in the alternative that Plaintiff's state and city law claims are preempted by the Federal Reserve Act, 12 U.S.C. § 341 (Fifth) ("the FRA"). For the reasons that follow, the Fed's motion to dismiss is denied.

## I. Background

The following facts are drawn from the First Amended Complaint and are presumed true for purposes of this motion.

Plaintiff worked for twenty-five years in the Fed's Information Technology Department. (Compl. at ¶ 11.) Just before his employment ended, Plaintiff had spent ten years in the Fed's Technology Services Group ("TSG"), where he "consistently met overall expectations," was "progressively promoted to more senior positions with salary increases," and "received an incentive bonus in 2009." (*Id.* at ¶ 11–12.) Until the events giving rise to this lawsuit, he never received a poor performance warning. (*Id.* at ¶ 13.)

On September 11, 2001 ("9/11"), Plaintiff was working in the N.Y. Fed Office located at 2 Federal Reserve Plaza, two blocks from the World Trade Center ("WTC"). (*Id.* at ¶ 14.) "After the planes crashed into the towers, Plaintiff was trapped in his office and believed he was going to die." (*Id.*) Plaintiff attended several in-house 9/11 counseling sessions sponsored by the Fed and, when his condition worsened in 2005, Plaintiff sought support from an employee assistance program. (*Id.* at ¶ 15) This treatment helped Plaintiff learn to cope with downtown New York City and allowed him to continue his career from 2001 to 2010. (*Id.* at ¶ 16.)

In January 2010, the TSG moved to a new office located on the 23rd floor of 3 World Financial Center ("WFC"). (*Id.* at ¶ 17.) That office overlooked Ground Zero. (*Id.*) To this day, in addition to its 3

WFC location, the Fed retains offices at 2 Federal Reserve Plaza and a "Main Building" (*id.* at ¶ 20)—and has set aside "hoteling sites" in the Main Building for use by Application Developers (*id.* at ¶ 21.) When the Fed moved staff to 3 WFC, it planned to install new technology, including webcams, to facilitate team productivity across buildings. (*Id.*)

To reach his new office at 3 WFC, Plaintiff "had to walk past the WTC site where a new tower was rising." (*Id.* at ¶ 24.) As a result of having to walk past and work next to the rising tower, Plaintiff "began suffering flashbacks to the events of 9/11 and developed severe difficulty sleeping, among other things." (*Id.*) His symptoms made it "difficult to concentrate at work," as he "dreaded walking around the area of his office and became anxious and depressed as a result of being so close to the new rising tower at Ground Zero." (*Id.*) Plaintiff feared that "there could be another attack at the WTC site" and that "3 WFC would be badly damaged and he would not survive." (*Id.* at ¶ 25.) "As Goonan had survived the 9/11 attacks when he was in 2 [Federal Reserve Plaza], he felt that he would be safer in the Main Building . . . which was a few blocks away from the WTC site." (*Id.*)

In October 2010, Plaintiff sought treatment at the WTC Health Clinic. (*Id.* at ¶ 26.) Before an appointment scheduled for early December, Plaintiff "began having suicidal thoughts" and called a helpline maintained by the Fed. (*Id.* at ¶ 27.) A psychiatrist diagnosed him with PTSD and recurrent Major Depression, and prescribed medication. (*Id.*) "As a result of the symptoms associated with the move to 3 WFC," Plaintiff received a "below standard" rating in late 2010—his first such rating from his supervisor, Julie Sun-Jannes. (*Id.* at ¶ 28.) He was not placed on written performance warning or subjected to increased supervision. (*Id.* at ¶ 29.)

In March 2011, Plaintiff spoke with Sun-Jannes about his health-related difficulties and requested permission to telecommute from home or move to the Main Building, "where the N.Y. Fed still had offices and his group already had some telecommuting cubicles set up." (*Id.* at ¶ 30.) She promptly told him to contact Dr. Gerald Stagg in the Fed's medical department to ask about an accommodation (*id.*), but warned him that he would get this accommodation only if his performance improved because telecommuting is a "privilege." (*Id.* at ¶ 31.) The Fed "was aware that Plaintiff's request for an accommodation was reasonable" because "[m]any of his essential job functions could be, and often were, performed remotely." (*Id.* at ¶ 32.)

Indeed, while located in WFC 3, Plaintiff "rarely" spoke in person with Sun-James, because she was located down the floor from his cubicle. (*Id.* at ¶ 22.) Instead, they communicated mainly through phone calls and e-mail. (*Id.*) Plaintiff telecommuted on Fridays, Sun-Jannes telecommuted on Mondays, and Plaintiff performed most of his work and client interaction remotely. (*Id.* at ¶ 23.) "As of 2011, approximately 70% of TSG employees telecommuted; 50% of those employees telecommuted on a regular schedule"—some from "as far away as North Carolina, Tennessee, Vermont and Minnesota." (*Id.* at ¶ 33.)

Plaintiff e-mailed Dr. Stagg, who told him to set up a meeting with the Fed's nurse, Lois Hitchcock, and to bring explanatory letters from his doctors. (*Id.* at ¶ 34.) Plaintiff met with Hitchcock on March 22, 2011 and again requested that his PTSD be accommodated by a change of location to allow time for his therapy to become effective. (*Id.* at ¶ 35.) He supported this request with letters from his

physicians; one clinician explained that Plaintiff had begun to experience "flashbacks, nightmares ... severe difficulty sleeping, anxiety, avoidance behavior and episodes of severe depression among other symptoms" when his "work setting was moved to an area directly adjacent to the site of the towers where the new tower is rising." (*Id.* at ¶ 36.) His psychiatrist added that "working in the area and seeing the sight of the tragedy stirred up past trauma," noting that Plaintiff had "developed severe symptoms with nightmares so severe that he dreaded going to sleep each night" and that "[h]is work performance suffered because he found it harder and harder to concentrate." (*Id.* at ¶ 37.) The psychiatrist recommended that Plaintiff "work in an environment where he won't be exposed frequently to the memories of trauma that causes [sic] his anxiety and depressive symptoms." (*Id.*)

Hitchcock made Plaintiff promise that he would not hurt himself. (*Id.* at ¶ 38). Nearly one month later, during which time Plaintiff "continued to struggle with his severe psychiatric symptoms" and became suicidal, the Fed responded to his request for an accommodation. (*Id.* at ¶ 39.) Specifically, Harry Zimbalist, Vice President of Application Development, informed Plaintiff that his request was denied due to poor performance and the need for supervision. (*Id.* at ¶ 40.) Zimbalist also offered a number of proposed alternative accommodations:

> He suggested moving [Plaintiff's] cubicle to the other side of the floor, limiting [Plaintiff's] exposure to the windows facing the WTC site; using a white noise or environmental sound machine; listening to soothing music using a headset; providing a multi-spectrum light for [Plaintiff's] work area; dividing large assignments into smaller tasks and steps; weekly meetings with a supervisor or manager to determine if goals are being met; and assignments provided in writing via e-mail.

(*Id.* at ¶ 41.) Plaintiff felt that none of these solutions would have resolved his crippling fear that 3 WFC would be destroyed in an attack (*id.*), and determined in consultation with his doctors that each of these options was insufficient because he would still have to travel to the WTC site for work, thereby limiting the effectiveness of his treatment (*id.* at ¶ 42). Plaintiff accordingly contacted Leon Taub, Senior Vice President and Ombudsman, to discuss the denial of his request for an accommodation:

> [Plaintiff] told Taub that he was concerned that management did not understand the seriousness of his condition. He asked Taub to have management review its denial. Taub, like Sun–Jannes and Zimbalist, told [Plaintiff] that his request for an accommodation was denied because he was a poor performer. Taub told [Plaintiff] that the decision to reject his request was based on [Plaintiff]'s purportedly poor performance over many years, which was untrue as [Plaintiff] was consistently rated as having met overall expectations until [the Fed] moved him to a building adjacent to Ground Zero. [Plaintiff] was not given any opportunity to object as Taub told [Plaintiff] that [the Fed] was not going to change its mind.

(*Id.* at ¶ 43.)

Despite these statements, the Fed did not increase Plaintiff's level of supervision. (*Id.* at ¶ 44.) Plaintiff continued to telecommute on Fridays, Sun–Jannes continued to telecommute on Mondays, and they maintained "infrequent contact[.]" (*Id.*) Plaintiff applied for several internal positions that would not require him to work at 3 WFC, but these applications were unsuccessful. (*Id.* at ¶ 45.)

"Because [the Fed] refused to accommodate [Plaintiff]'s condition, his symptoms of PTSD and Major Depression persisted." (*Id.* at ¶ 46.) Plaintiff continued to experience suicidal thoughts and, by May 2011, his work conditions were so intolerable that he could no longer work at 3 WFC. (*Id.*) "Rather than risk committing suicide, [Plaintiff] decided to retire from [the Fed]." (*Id.*) On May 24, 2011, Plaintiff notified Zimbalist that he intended to retire because the alternatives offered to him would not resolve his problems. (*Id.* at ¶ 47.) Zimbalist replied that he was "sorry to learn that the accommodations offered to [Plaintiff] to address [his] problem did not meet [Plaintiff's] needs." (*Id.*) "Neither Zimbalist nor management made any further attempts to engage [Plaintiff] in discussions about his request for an accommodation." (*Id.*) Plaintiff's retirement became effective on August 1, 2011. (*Id.* at ¶ 48.)

## II. Standard of Review

To survive a motion to dismiss pursuant to Federal Rule 12(b)(6), a plaintiff must plead sufficient factual allegations "to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). The Court must accept as true all well-pleaded factual allegations in the complaint, and "draw [ ] all inferences in the plaintiff's favor." *Allaire Corp. v. Okumus,* 433 F.3d 248, 249–50 (2d Cir.2006) (internal quotations omitted). That said, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of

the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937. In a recent summary of the plausibility standard, the Second Circuit explained that:

> [T]he *Twombly* Court stated that a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, but mere labels and conclusions or formulaic recitations of the elements of a cause of action will not do; rather, the complaint's factual allegations must be enough to raise a right to relief above the speculative level, i.e., enough to make the claim plausible.

*Arista Records, LLC v. Doe 3,* 604 F.3d 110, 120 (2d Cir.2010) (quoting *Twombly,* 550 U.S. at 555, 570, 127 S.Ct. 1955) (quotation marks and internal citations omitted). The Circuit clarified that this rule "does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of illegality." *Id.* (citing *Twombly,* 550 U.S. at 556, 127 S.Ct. 1955) (quotation marks omitted).

## III. Discussion

### A. Discrimination and Reasonable Accommodation

#### 1. Legal Standard

■ "A plaintiff suing under the ADA for disability discrimination bears the burden of establishing a prima facie case. In so-called reasonable-accommodation cases, such as this one, the plaintiff's burden requires a showing that (1) plaintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has

refused to make such accommodations." *Graves v. Finch Pruyn & Co., Inc.*, 457 F.3d 181, 183–84 (2d Cir.2006) (citation and quotation marks omitted).[1] The ADA provides that "discrimination" occurs when an employer does "not [make] reasonable accommodations to the known physical or mental limitations of an otherwise qualified ... employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of [its] business." 42 U.S.C. § 12112(b)(5)(A); *see also U.S. Airways, Inc. v. Barnett,* 535 U.S. 391, 396, 122 S.Ct. 1516, 152 L.Ed.2d 589 (2002).

■■■ EEOC regulations define "reasonable accommodation" to include "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable an individual with a disability who is qualified to perform the essential functions of that position." 29 C.F.R. § 1630.2(*o*)(1)(ii). "Ineffective modifications are ... not accommodations." *U.S. E.E.O.C. v. UPS Supply Chain Solutions,* 620 F.3d 1103, 1110 (9th Cir.2010) (citation omitted). EEOC interpretive guidance states that "the employer providing the accommodation has the ultimate discretion to choose between effective accommodations, and may choose the less expensive accommodation or the accommodation that is easier for it to provide." Interpretive Guidance on Title I of the Americans with Disabilities Act, 29 C.F.R. Part 1630, App., 56 Fed. Reg. 35,726–01, 35,749 (July 26, 1991). If an employer believes a requested accommodation would create undue hardship, it can raise this position as an affirmative defense that looks to specific enumerated statutory factors. *See Lovejoy–Wilson v. NOCO Motor Fuel, Inc.,* 263 F.3d 208, 221 (2d Cir.2001) (discussing 42 U.S.C. § 12111(10)(A)-(B) and examining (1) the employer's type of operation, including its composition, structure, and the functions of its workforce; (2) the employer's overall financial resources; (3) the financial resources involved in the provision of the reasonable accommodation; and (4) the impact of such accommodation upon the employer's operation).

■■■ "To avoid unfounded reliance on uninformed assumptions, the identification of the essential functions of a job requires a fact-specific inquiry into both the employer's description of a job and how the job is actually performed in practice." *Borkowski v. Valley Cent. Sch. Dist.,* 63 F.3d 131, 140 (2d Cir.1995) (citation omitted). "[T]he determination of whether a particular modification is 'reasonable' involves a fact-specific, case-by-case inquiry that considers, among other factors, the effectiveness of the modification in light of the nature of the disability in question and the cost to the organization that would implement it." *Staron v. McDonald's Corp.,* 51 F.3d 353, 356 (2d Cir.1995) (citations omitted).

When an employee who satisfies the ADA's other requirements requests an accommodation, this request triggers an interactive process:

> To determine the appropriate reasonable accommodation it may be necessary for the [employer] to initiate an informal, interactive process with the quali-

---

1. "A claim of disability discrimination under the New York State Human Rights Law, N.Y. Exec. Law §§ 290–301 (McKinney 2005), is governed by the same legal standards as govern federal ADA claims. *Parker v. Columbia Pictures Indus.,* 204 F.3d 326, 332 n. 1 (2d Cir.2000). Thus, to the extent that [Plaintiff] brings a state-law disability-discrimination claim, it survives or fails on the same basis as his ADA claim." *Graves,* 457 F.3d 181, 186 n. 3 (2d Cir.2006).

fied individual with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.

29 C.F.R. § 1630.2(*o* )(3) (1995). Both parties must participate. "[T]he employer must make a reasonable effort to determine the appropriate accommodation. The appropriate reasonable accommodation is best determined through a flexible, interactive process that involves both the employer and the [employee] with a disability." 29 C.F.R. Pt. 1630, App. § 1630.9; *see also Brady v. Wal–Mart Stores, Inc.,* 531 F.3d 127, 135 (2d Cir. 2008) ("We have held that the ADA contemplates that employers will engage in an 'interactive process' with their employees and in that way work together to assess whether an employee's disability can be reasonably accommodated." (citation and quotation marks omitted)). The Third Circuit has described the operation of this process: "meet[ing] with the employee who requests an accommodation, request[ing] information about the condition and what limitations the employee has, ask[ing] the employee what he or she specifically wants, show[ing] some sign of having considered [the] employee's request, and offer[ing] and discuss[ing] available alternatives when the request is too burdensome." *Taylor v. Phoenixville Sch. Dist.,* 174 F.3d 142, 162 (3d Cir.1999).

In *Beck v. Univ. of Wisconsin Bd. of Regents,* 75 F.3d 1130 (7th Cir.1996), the Seventh Circuit influentially described how courts should assess claims of a breakdown:

> No hard and fast rule will suffice, because neither party should be able to cause a breakdown in the process for the purpose of either avoiding or inflicting liability. Rather, courts should look for

signs of failure to participate in good faith or failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary. A party that obstructs or delays the interactive process is not acting in good faith. A party that fails to communicate, by way of initiation or response, may also be acting in bad faith. In essence, courts should attempt to isolate the cause of the breakdown and then assign responsibility.

*Id.* at 1135.

■■■■ "Liability for failure to provide a reasonable accommodation ensues only when the employer is responsible for a breakdown in that process." *Thompson v. City of New York,* No. 03 Civ. 4182, 2006 WL 2457694, at *4 (S.D.N.Y. Aug. 10, 2006) *report and recommendation adopted,* No. 03 Civ. 4182, 2006 WL 6357978 (S.D.N.Y. Sept. 11, 2006) *aff'd sub nom. Thompson v. New York City Dept. of Prob.,* 348 Fed.Appx. 643 (2d Cir.2009). "An employer impedes the process when: the employer knows of the employee's disability; the employee requests accommodations or assistance; the employer does not in good faith assist the employee in seeking accommodations; and the employee could have been reasonably accommodated but for the employer's lack of good faith." *Bohen v. Potter,* No. 04 Civ. 1039, 2009 WL 791356, at *13 (W.D.N.Y. Mar. 23, 2009) (citing *Kratzer v. Rockwell Collins, Inc.,* 398 F.3d 1040, 1045 (8th Cir. 2005) (citation omitted)). Courts must deny motions to dismiss or motions for summary judgment when presented with conflicting facts about the provenance of a breakdown, *see, e.g., id.* at *14, but in the absence of a factual dispute may grant such motions, *see, e.g., Gingold v. Bon Secours Charity Health Sys.,* 768 F.Supp.2d 537, 544 (S.D.N.Y.2011); *Dono-*

*frio v. New York Times,* No. 99 Civ. 1576, 2001 WL 1663314 (S.D.N.Y. Aug. 24, 2001) *report and recommendation adopted,* No. 99 Civ. 1576, 2002 WL 230820 (S.D.N.Y. Feb. 14, 2002).

"Courts have struggled to define the appropriate burdens of persuasion when [the interactive] process breaks down and an employee seeks relief on the ground that his employer failed to 'reasonably accommodate' his disability." *Jackan v. New York State Dept. of Labor,* 205 F.3d 562, 566 (2d Cir.2000) (assigning the burden of persuasion to a plaintiff when the question is whether a vacancy exists). In *Borkowski v. Valley Central School District,* however, the Second Circuit stated its general rule for disputes over reasonable accommodation:

> As to the requirement that an accommodation be reasonable, we have held that the plaintiff bears only a burden of production. This burden, we have said, is not a heavy one. It is enough for the plaintiff to suggest the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits. Once the plaintiff has done this, she has made out a *prima facie* showing that a reasonable accommodation is available, and the risk of nonpersuasion falls on the defendant. At this point the defendant's burden of persuading the factfinder that the plaintiff's proposed accommodation is unreasonable merges, in effect, with its burden of showing, as an affirmative defense, that the proposed accommodation would cause it to suffer an undue hardship.

63 F.3d at 138.

The Second Circuit has explained that "[a] modified work schedule may constitute a reasonable accommodation in certain circumstances ... [b]ut a scheduling accommodation is not reasonable if it, in essence, requires an employer to eliminate an es-

sential function of a job." *Rodal v. Anesthesia Group of Onondaga, P.C.,* 369 F.3d 113, 120 (2d Cir.2004). Courts have denied summary judgment when presented with fact issues concerning the reasonableness of a "fully flexible schedule"—including one case where a mainframe computer programmer had operated with such a schedule for 15 years. *Varone v. City of New York,* No. 02 Civ. 1089, 2003 WL 21787475, at *15 (S.D.N.Y. Aug. 4, 2003); *see also Humphrey v. Mem'l Hospitals Ass'n,* 239 F.3d 1128, 1138–39 (9th Cir. 2001) ("MHA's rejection of Humphrey's work-at-home request and its failure to explore with Humphrey the possibility of other accommodations, once it was aware that the initial arrangement was not effective, constitutes a violation of its duty regarding the mandatory interactive process.").

Finally, the Second Circuit has "ruled that failure to make reasonable accommodation, when the employee has satisfied the first three elements of his claim, amounts to discharge 'because of' his disability." *Parker v. Columbia Pictures Indus.,* 204 F.3d 326, 332 (2d Cir.2000) (citing *Ryan v. Grae & Rybicki, P.C.,* 135 F.3d 867, 870 (2d Cir.1998)).

### 2. Application of Law to Facts

In its motion papers, the Fed assumes that Plaintiff is a person with a disability (PTSD) and that it was on notice of his disability. The Court adopts those assumptions. Further, while the Fed indicates that its management and Plaintiff's supervisors did not view Plaintiff's requested accommodation as "reasonable or feasible" (Mem. of Law in Supp. of Def.'s Mot. to Dismiss Pl.'s Am. Compl. ("Mot. to Dismiss"), at 6), the Fed does not argue that Plaintiff's claim fails because his proposed accommodation would have imposed an "undue hardship." Rather, the Fed argues that its proposed accommodations

were reasonable and that, when Plaintiff resigned in lieu of attempting the proposed accommodations, he terminated the interactive process.

Here, the Fed responded to Plaintiff's request for an accommodation in three ways: (1) denying his request on the ground of poor performance; (2) proposing a number of alternative accommodations; and (3) indicating that it was unwilling to reconsider the matter. Because the Fed told Plaintiff that it "was not going to change its mind" regarding his request or its proposed alternatives (Compl. at ¶ 43), the Fed's two arguments partly blur into a single question: whether the proposed alternative accommodations were reasonable. If they were not, then the Fed *did* engage in an adverse action by failing to reasonably accommodate; by the same token, if the Fed offered unreasonable accommodations and flatly stated that it would not change its mind, then the Fed can be held accountable for terminating the interactive process. At the motion to dismiss stage, the Fed bears the weighty burden of showing that the fact-intensive inquiry prerequisite to a finding of reasonable accommodation falls completely in its favor. *See Borkowski*, 63 F.3d at 140; *Staron*, 51 F.3d at 356.

Because the relevant dispute is whether the Fed engaged in an adverse employment action, and because the Fed does not base its motion to dismiss on the ground that Plaintiff's proposed accommodation would have imposed an undue burden, the issue is not whether Plaintiff's requested accommodation was reasonable, but rather whether the Fed's proposed alternatives fit

that description. *See* 42 U.S.C. § 12112(b)(5)(A) (providing that "discrimination" occurs when an employer does "not [make] reasonable accommodations to the known physical or mental limitations of an otherwise qualified [employee]").[2]

■ The Court concludes that Plaintiff has pleaded sufficient facts regarding the unreasonableness of the Fed's proposed accommodations "to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955. In other words, given the fact intensive nature of the relevant inquiry and the strength of Plaintiff's pleadings, the Court cannot conclude as a matter of law that the Fed's proposed accommodations were reasonable.

Specifically, Plaintiff informed the Fed—and supported that act with letters from his treating doctors—that his PTSD was triggered by "walk[ing] past the WTC site where a new tower was rising," noting that he "dreaded walking around the area of his office and became anxious and depressed as a result of being so close to the new rising tower at Ground Zero." (Compl. at ¶ 24.) His psychiatrist noted that Plaintiff started to experience "flashbacks, nightmares ... severe difficulty sleeping, anxiety, avoidance behavior and episodes of severe depression among other symptoms" when his "work setting was moved to an area directly adjacent to the site of the towers where the new tower is rising." (*Id.* at ¶ 36.) The same doctor recommended that Plaintiff "work in an environment where he won't be exposed frequently to the memories of trauma that

---

2. In any event, the Court notes that at this early stage in the litigation, it would be inappropriate to deem unreasonable Plaintiff's request for some combination of a transfer or permission to telecommute. Plaintiff supported this request with documentation from treating psychiatrists explaining his specific

need to vacate the 3 WFC location and has offered facts sufficient to support the claim that transfer or telecommuting were realistic options. Further, precedent suggests that requests of this sort may be reasonable under the ADA. *See, e.g., Rodal*, 369 F.3d at 120; *Humphrey*, 239 F.3d at 1138–39.

causes [sic] his anxiety and depressive symptoms." (*Id.*) In response to this information, the Fed offered a number of alternatives: moving Plaintiff's cubicle; relocating Plaintiff away from the window; a white noise machine; a headset with soothing music; multi-spectrum lights; breaking down assignments into smaller pieces; weekly meetings with his supervisors; and the provision of assignments in writing or via e-mail.

 The Fed explains that it insisted on this set of accommodations, and rejected Plaintiff's requested accommodation, because of Plaintiff's poor performance.[3] This explanation is troubling, since denial of an accommodation on the ground that a non-accommodated, disabled employee is experiencing performance inadequacies turns the rationale for the ADA's rule of reasonable accommodation on its head. *See Borkowski*, 63 F.3d at 143 ("Failure to consider the possibility of reasonable accommodation for such disabilities, if it leads to discharge for performance inadequacies resulting from the disabilities, amounts to a discharge solely because of the disabilities."). Poor performance begs the question, but does not answer it.

Regardless, looking to the facts as described in the First Amended Complaint, the Court disagrees with the Fed that its proposed accommodations should be deemed reasonable as a matter of law. Plaintiff's request for a transfer or permission to telecommute turned on his abject terror of walking to and spending his day in a building located immediately adjacent to Ground Zero. (Compl. at ¶¶ 15–25.) None of the Fed's proposed accommodations would have addressed the problem posed by WFC 3's location, which required Plaintiff to aggravate his PTSD each day as he arrived at and exited his place of work. Nor is it obvious that the proposed accommodations would have sufficed to alleviate the anxiety Plaintiff uniquely associated with working in a building that, to a far greater extent than nearby buildings, risked a repeat terror attack. The mere fact that the Fed offered a number of alternatives does not render them individually or collectively reasonable. *See Scalera v. Electrograph Sys., Inc.*, 848 F.Supp.2d 352, 367 (E.D.N.Y.2012).

The Court accordingly concludes that Plaintiff has pleaded sufficient factual allegations to support the conclusion that the Fed's proposed accommodations would not have accommodated his disability and were therefore unreasonable. *See E.E.O.C. v. Sears, Roebuck & Co.*, 417 F.3d 789, 803 (7th Cir.2005) ("A reasonable jury could find that, because it did not effectively accommodate Keane's limitations, this was not a reasonable accommodation.").

This leaves the question whether Plaintiff nonetheless disrupted the interactive process and thereby assumed responsibility for the Fed's failure to accommodate. The Fed argues that Plaintiff's bad faith is evidenced by two facts: his refusal to try the proposed accommodations and his decision to retire rather than pursue a dialogue after speaking with Taub and Zimbalist.

 These arguments do not succeed. Where an employer offers an employee a battery of unreasonable accommodations, that employee is not obliged to try them all out before returning to the interactive process. That is particularly true where the employer has flatly stated

---

**3.** The Fed's briefing papers also suggest that Plaintiff's request would have imposed an undue hardship, but its motion does not rely on that claim and, in any event, the Court cannot conclude on these facts that Plaintiff's request would have imposed an undue hardship on the Fed.

that it is "not going to change its mind," thereby affirming that the unreasonable options constitute the full extent of its willingness to arrive at a mutually satisfactory accommodation. By extension, where an employer indicates that it is willing to consider an accommodation, but impliedly conditions any sort of reasonable accommodation on improved performance, that employer has acted in precisely the sort of bad faith the ADA prohibits.

 Here, Plaintiff wrestled with suicidal thoughts, intense anxiety, and a number of other severe symptoms associated with his aggravated PTSD. In light of the Fed's warning that it would not contemplate alternative accommodations, or would consider them only after improved performance, Plaintiff's decision to forgo an inadequate parade of advanced light fixtures, soothing soundtracks, windowless desks, and micro-managed assignments hardly constituted bad faith. So too his refusal to continue a dialogue after speaking with Taub and Zimbalist, both of whom affirmed the Fed's uncompromising position.

The Court concludes that Plaintiff has pleaded factual allegations sufficient to show that the Fed failed "to participate in good faith" and to "make reasonable efforts to help the other party determine what specific accommodations are necessary." *Beck*, 75 F.3d at 1135. Because "liability for failure to provide a reasonable accommodation ensues . . . when the employer is responsible for a breakdown in [the interactive] process," *Thompson*, 2006 WL 2457694, at *4, this conclusion defeats the Fed's motion to dismiss Plaintiff's discrimination claims.

Ultimately, Plaintiff can plausibly allege that he was discriminated against—and thereby discharged—because of his disability. *See Parker*, 204 F.3d at 332.

## B. Retaliation

### 1. Legal Standard

The ADA "prohibits, *inter alia*, retaliation against any individual who has asserted rights under the ADA." *Sarno v. Douglas Elliman–Gibbons & Ives, Inc.*, 183 F.3d 155, 159 (2d Cir.1999); *see* 42 U.S.C. § 12203(a) ("No person shall discriminate against any individual because such individual . . . made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter."); *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006) ("In our view, a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." (quotation marks and citation omitted)).

 To establish a claim of retaliation under the ADA, a plaintiff must show that "(1) he engaged in an activity protected by the ADA; (2) the employer was aware of this activity; (3) the employer took adverse employment action against him; and (4) a causal connection exists between the alleged adverse action and the protected activity." *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir.2002). "Although the burden at the prima facie stage is *de minimis*, Plaintiff must proffer at least competent evidence of circumstances that would be sufficient to permit a rational finder of fact to infer a discriminatory motive." *Smiley v. Cassano*, No. 10 Civ. 3866, 2012 WL 967436, at *4 (S.D.N.Y. Mar. 21, 2012) (citations omitted).

 "With respect to the first element . . . in order to establish a prima facie case, Plaintiff must prove that he engaged in a 'protected activity.' Protected activity typically 'refers to action taken

to protest or oppose statutorily prohibited discrimination.'" *Id.* at *5 (citing *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir.2000)). With respect to the third element, the Second Circuit has "defined adverse employment action broadly to include 'discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand.'" *Lovejoy–Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 223 (2d Cir.2001) (quoting *Morris v. Lindau,* 196 F.3d 102, 110 (2d Cir.1999)). With respect to the fourth element, "proof of causation can be shown either: (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by [the defendant]." *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir.2000).

### 2. Application of Law to Facts

 Plaintiff alleges that he suffered retaliation when his request to telecommute was denied because the Fed held him to a higher standard than other employees. "It is well established that 'requesting an accommodation ... [is] behavior protected from an employer's

retaliation." *Carreras v. Sajo, Garcia & Partners,* 596 F.3d 25, 35–36 (1st Cir. 2010) (quoting *Wright · v. CompUSA, Inc.,* 352 F.3d 472, 477–78 (1st Cir. 2003)). The Fed offered as its legitimate, nondiscriminatory basis for this decision its finding that Plaintiff's performance had suffered. At the motion to dismiss stage, however, the Court need not accept this bald allegation as true.

Plaintiff's request for an accommodation was protected by the ADA, the Fed was aware of his request, the Fed took adverse action by refusing to allow Plaintiff to participate in a policy that it afforded to a significant number of employees, and Plaintiff has plausibly alleged a causal connection between his request for an accommodation (which first put the Fed on notice of his disability) and the alleged adverse action (denial of his request, constituting discriminatory treatment as compared to coworkers). The Court therefore denies the Fed's motion to dismiss Plaintiff's retaliation claims. *See Treglia,* 313 F.3d at 719.[4]

### C. Preemption of the NYSHRL and NYCHLR

The Fed argues in the alternative that Plaintiff's state and local claims must be

---

4. The parties also dispute whether Plaintiff was constructively discharged. To the extent the Fed views constructive discharge as Plaintiff's theory of liability for the discrimination claims, that view is mistaken. As Plaintiff explains, "[f]ailure to make reasonable accommodation ... amounts to discharge 'because of' his disability." *Parker,* 204 F.3d at 332 (citing *Ryan,* 135 F.3d at 870). To the extent the Fed views constructive discharge as part of Plaintiff's theory of liability for retaliation—in which context the 'constructive discharge' would presumably be the requisite 'adverse action'—it appears to misconstrue Plaintiff's claim, which turns on the Fed's decision to treat Plaintiff differently from his

coworkers because he requested an accommodation. Regardless, at this stage in the litigation, Plaintiff has pleaded factual allegations sufficient to plausibly demonstrate that the Fed's refusal to provide reasonable accommodations constituted a deliberate choice to create working conditions that forced retirement. *See Kader v. Paper Software, Inc.,* 111 F.3d 337, 341 (2d Cir.1997) (noting that, to prove constructive discharge, a plaintiff must show "the employer deliberately created working conditions that were so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." (quotation marks and citation omitted)).

dismissed because they are preempted by the Federal Reserve Act. In relevant part, the FRA empowers the Fed "[t]o appoint by its board of directors a president, vice presidents, and such officers and employees as are not otherwise provided for in this chapter, to define their duties, require bonds for them and fix the penalty thereof, and to *dismiss at pleasure such officers or employees.*" 12 U.S.C. § 341 (Fifth) (emphasis added).[5] The "dismiss at pleasure" language, enacted by Congress in 1913 as part of the FRA, was taken from a similar provision of the National Bank Act, 12 U.S.C. § 21–216d, which in turn was enacted by Congress in 1864. The Fed concedes that in enacting the ADA itself, Congress impliedly repealed the FRA's "dismiss at pleasure" provision. It argues, however, that state and local analogs of the ADA are preempted by that provision.

### 1. Overview of Preemption Doctrine

"The Supremacy Clause establishes that federal law 'shall be the supreme Law of the Land ... any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.'" *PLIVA, Inc. v. Mensing,* ── U.S. ──, 131 S.Ct. 2567, 2577, 180 L.Ed.2d 580 (2011) (quoting U.S. CONST., Art. VI, cl. 2). "Consistent with that command, we have long recognized that state laws that conflict with federal law are 'without effect.'" *Altria Group, Inc. v. Good,* 555 U.S. 70, 76, 129 S.Ct. 538, 172 L.Ed.2d 398 (2008) (quoting *Maryland v. Louisiana,* 451 U.S. 725, 746, 101 S.Ct. 2114, 68 L.Ed.2d 576 (1981)). The Second Circuit has recently summarized the Supreme Court's doctrine of preemption:

> [T]hree types of preemption exist: (1) express preemption, where Congress has expressly preempted local law; (2) field preemption, where Congress has

legislated so comprehensively that federal law occupies an entire field of regulation and leaves no room for state law; and (3) conflict preemption, where local law conflicts with federal law such that it is impossible for a party to comply with both or the local law is an obstacle to the achievement of federal objectives.

*New York SMSA Ltd. P'ship v. Town of Clarkstown,* 612 F.3d 97, 104 (2d Cir.2010) (quotation marks and citations omitted); *see also English v. Gen. Elec. Co.,* 496 U.S. 72, 78–79, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990).

"Under all of these three preemption tests—express, field, and conflict—our task is to determine whether, and to what extent, Congress intended to preempt state law." *Niagara Mohawk Power Corp. v. Hudson River–Black River Regulating Dist.,* 673 F.3d 84, 95 (2d Cir. 2012). Thus, "[t]he purpose of Congress is the ultimate touchstone in every pre-emption case." *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 485, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996) (citations and quotation marks omitted); *see also English,* 496 U.S. at 78–79, 110 S.Ct. 2270 ("Pre-emption fundamentally is a question of congressional intent."). "Congress may manifest its intent to preempt state or local law explicitly, through the express language of a federal statute, or implicitly, through the scope, structure, and purpose of the federal law." *New York SMSA Ltd. P'ship,* 612 F.3d at 104.

The Supreme Court instructs federal courts to exercise a weighty presumption against preemption, particularly in areas of traditional state control:

> [B]ecause the States are independent sovereigns in our federal system, we

---

5. The key provision from § 341 (Fifth) is referred to herein as the "dismiss at pleasure provision."

have long presumed that Congress does not cavalierly pre-empt state-law causes of action. In all pre-emption cases, and particularly in those in which Congress has legislated ... in a field which the States have traditionally occupied, we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress ... [This] approach is consistent with both federalism concerns and the historic primacy of state regulation of matters of health and safety.

*Medtronic,* 518 U.S. at 485, 116 S.Ct. 2240 (quotation marks and citations omitted); *see also Wyeth v. Levine,* 555 U.S. 555, 565, 129 S.Ct. 1187, 173 L.Ed.2d 51 (2009); *In re Legacy Healthcare, LLC,* 447 Fed. Appx. 236, 240–41 (2d Cir.2011) ("Federal courts will not readily assume conflict pre-emption of a state law involving the exercise of the police power unless 'the two acts cannot be reconciled or consistently stand together.'" (quoting *Madeira v. Affordable Hous. Found., Inc.,* 469 F.3d 219, 241–42 (2d Cir.2006) (internal quotation marks omitted))). This presumption extends to laws "enacted pursuant to the State's historic police powers to prohibit discrimination on specified grounds." *Kroske v. U.S. Bank Corp.,* 432 F.3d 976, 981 (9th Cir.2005) (citation omitted).

## 2. Relevant Judicial Precedent

Courts are divided over whether and to what extent the FRA preempts state and local employment discrimination laws. The first decision on this issue was issued by the Sixth Circuit in 1987. That court noted in a single paragraph and without elaboration that "inasmuch as [the plaintiff] was an employee of a Federal Reserve Bank, her rights under [state law] were preempted by federal law ... [the FRA's "dismiss at pleasure"] provision preempts any state-created employment right to the contrary." *Ana Leon T. v. Fed. Reserve Bank of Chicago,* 823 F.2d 928, 931 (6th Cir.1987). The Sixth Circuit later reaffirmed this ruling in *Arrow v. Federal Reserve Bank of St. Louis,* concluding that "employment rights created by state law" are preempted by the FRA. 358 F.3d 392, 393 (6th Cir.2004). Under the Sixth Circuit's interpretation, state anti-discrimination laws are preempted *in their entirety* by the FRA.

In 1992, Chief Judge Mihm of the Central District of Illinois concluded that the FRA does not prevent recovery under the ADEA and ERISA. *See Mueller v. First Nat. Bank of Quad Cities,* 797 F.Supp. 656 (C.D.Ill.1992). Explaining that "there is no authority in legislative history or common law which specifically addresses the impact of the provisions of the ADEA and ERISA" upon the Fed's right to terminate employees, he found that "Congress intended the 'at pleasure' language to mean 'at will' as applied in the common law." *Id.* at 663. Because the Fed's broad latitude to hire and fire was thus "intended in a contractual sense," *id.,* Chief Judge Mihm agreed with the plaintiff's argument that "his lack of contractual rights [did] not alter his remedies under ERISA and ADEA as these rights [were] not premised on the presence of a contractual relationship," *id.* at 662. Chief Judge Mihm added that "the public policy concern underlying [this provision of the FRA] involve[s] the banking community's ability to remove inefficient, incompetent, or dishonest officers 'at will' without contractual challenges stemming from oral representations, employee handbooks, and ambiguous contractual language." *Id.* at 663.

One year later, Judge Lasker of this District confronted the question presently at issue. *See Moodie v. Fed. Reserve Bank of New York,* 831 F.Supp. 333

(S.D.N.Y.1993) ("*Moodie I* "). Disagreeing with the Sixth Circuit, and observing that preemption hinges on congressional intent, he noted that "The Bank has put nothing before us to support the view that considerations relating to employment discrimination were of concern to the Congress at that time." *Id.* at 336. He added that Congress "intended the Federal Reserve Banks to be employers at will, conferring no special tenure or contractual rights upon their employees," *id.* at 336–37, finding "nothing" in § 341 to support "the Bank's view that Congress intended that section to exempt the Federal Reserve Banks, in the area of employment discrimination, from statutes or regulations of the states in which they operate, particularly when the state statutory scheme is consistent with federal legislation." *Id.* at 337. In a subsequent opinion reconsidering his ruling in *Moodie I,* Judge Lasker clarified his "earlier determination that Congress did not intend 12 U.S.C. § 341(5) to preempt state anti-discrimination laws that are consistent with federal anti-discrimination legislation." *Moodie v. Fed. Reserve Bank of New York,* 835 F.Supp. 751, 753 (S.D.N.Y.1993) ("*Moodie II* "). Neither *Moodie I* nor *Moodie II* held that state anti-discrimination laws broader than federal anti-discrimination laws are preempted, or explained why such preemption would occur. However, whereas *Moodie I* strongly suggests that there is no preemption at all (merely noting that conformity with federal law renders the case for non-preemption even stronger), *Moodie II* hints that preemption might, in fact, occur under certain circumstances.

The non-preemption view acquired another adherent in *Katsiavelos v. Fed. Reserve Bank of Chicago,* No. 93 Civ. 7724, 1995 WL 103308 (N.D.Ill. Mar. 3, 1995). Judge Hart explained:

> [D]ismiss at pleasure is analogous to dismiss at will, implying the absence of a contractual relationship between employer and employee. The right to be free from discrimination is not a contractual right, and therefore is not necessarily embodied in the dismiss at pleasure language. Consequently, the Federal Reserve Act pre-empts the [Illinois Human Rights Act] only if legislative history reveals that Congress intended the field to be completely occupied by federal law or if state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *English,* 496 U.S. at 79, 110 S.Ct. 2270.

*Id.* at *2. Finding that Congress did not intend federal law to occupy the field exclusively, *id.* at *3, Judge Hart cited Mueller to show that the FRA does not grant immunity from federal anti-discrimination laws, *id.* (citing *Mueller,* 797 F.Supp. at 663), and an Oklahoma Supreme Court decision authorizing a tortious discharge claim against a national bank notwithstanding similar language in the National Bank Act, *id.* (citing *Sargent v. Central National Bank and Trust Co. of Enid, Oklahoma,* 809 P.2d 1298, 1302 (Ok.1991)). Judge Hart also found no conflict preemption, as the state law at issue in Katsiavelos was modeled on Title VII. *Id.* at *4. Noting that "the Congress of 1913 could not have contemplated the tremendous rise of state and federal discrimination laws" and could not have "foreseen the economic need for the joint state/federal enforcement scheme of Title VII and related discrimination laws," he explained that "[a] finding that the Federal Reserve Act pre-empts [the Illinois state anti-discrimination law] could inadvertently frustrate the goals of Title VII by eliminating joint state/federal enforcement for any employee subject to 'at pleasure' provisions under federal banking laws, thereby increasing

the burden on the EEOC." *Id.* (citation and footnote omitted). Judge Hart concluded that the Fed "remains subject to the provisions of the [state law] because the 'at pleasure' language of the Federal Reserve Act only serves to pre-empt state law created contractual employment rights." *Id.*

A decade later, the Ninth Circuit addressed preemption of state anti-discrimination laws under the National Bank Act ("NBA"). *See Kroske,* 432 F.3d at 976. The court first held that the NBA's "dismiss-at-pleasure" provision does not preempt the "entire field of law governing national banks' employment practices" because "the at-pleasure provision is not accompanied by a pervasive regulatory scheme that governs the dismissal of bank officers." *Id.* at 982.

Turning to conflict preemption, the court acknowledged that "[t]he meaning and scope of the at-pleasure provision is not defined by statute, regulations, or legislative history," but noted that an early case addressing the clause described its purpose in broad and sweeping terms. *Id.* at 983 (quoting *Westervelt v. Mohrenstecher,* 76 F. 118, 122 (8th Cir.1896)). The court added that "[t]he original congressional intent behind the at-pleasure provision of the Bank Acts was to ensure the financial stability of the banking institutions by affording them the means to discharge employees who were felt to compromise an institution's integrity." *Id.* at 983–84 (quoting Sharon A. Kahn & Brian McCarthy, *At–Will Employment in the Banking Industry: Ripe for a Change,* 17 Hofstra Lab. & Emp. L.J. 195, 215 (1999)). Noting that the dismiss at pleasure language is "analogous to dismiss at will," *id.* at 984 (quoting *Katsiavelos,* 1995 WL 103308, at *2), the court added that the Ninth Circuit had found that it bars contract and tort claims. *Id.*

Rather than embrace the Sixth Circuit's broad preemption rule, however, the court explained that "federal preemption of the [Washington state law] must be considered in light of Congress's enactment of relevant federal employment discrimination laws and the cooperative state-federal anti-discrimination scheme"—particularly where "we are confronted with a state statute prohibiting discrimination, which is modeled after and incorporated into the federal anti-discrimination laws." *Id.* at 985 (footnote omitted). To that end, the court recognized that the "ADEA is part of 'an ongoing congressional effort to eradicate discrimination in the workplace, [and] reflects a societal condemnation of invidious bias in employment decisions.'" *Id.* at 986 (quoting *McKennon v. Nashville Banner Publ'g Co.,* 513 U.S. 352, 357, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995)). Identifying an "irreconcilable conflict" between the ADEA and the NBA, the court concluded that the ADEA partially repeals the NBA's dismiss at pleasure provision, but "only to the extent necessary to give effect of the ADEA." *Id.* at 987. Because the disputed state provision in *Kroske* mirrored the ADEA, the court found no conflict preemption, a conclusion "buttressed by the 'importance of state fair employment laws to the federal enforcement scheme.'" *Id.* at 988 (quoting *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 102, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983)). The court added, however, that a preemption-inducing conflict may occur when a state anti-discrimination provision would disrupt the NBA's uniform scheme by failing to "substantively mirror[ ] a claim under the ADEA." *Id.* at 989.

One year later, the Third Circuit weighed in on the FRA's preemptive effect in *Fasano v. Federal Reserve Bank of New York,* 457 F.3d 274 (3d Cir.2006). Following *Kroske,* the court concluded

that the ADA irreconcilably conflicts with and therefore impliedly repeals the FRA's dismiss at pleasure provision. *Id.* at 284. This finding of implied repeal was deemed necessary because "Section 341(Fifth) grants Federal Reserve Banks the absolute, unlimited power to dismiss an employee," while the ADA *"prohibit*[s] a Federal Reserve Bank from dismissing an employee on the ground of a covered disability, from refusing to grant an employee's request for an accommodation, or from dismissing an employee for having filed a complaint alleging a violation of law." *Id.* at 285 (emphasis in original).

"Wad[ing] into murky waters," the court also concluded that the FRA's dismiss at pleasure provision extends beyond a bar on contractual employment claims to also preempt statutory employment claims. *Id.* at 286. "The same rationale applies to permitting statutory claims where contractual claims would be barred—any discretion granted to the Federal Reserve Banks by Congress would be mooted by the possibility of having to face statutory employment claims." *Id.* at 287. The court therefore held that "Federal Reserve Act § 341 (Fifth), as impliedly amended by [the ADA], preempts *any* state employment law that goes beyond the remedies and protections provided by" federal law, since any broader state provision "would conflict with Congress's intent to provide Federal Reserve Banks with the broadest latitude possible in carrying out their statutory duties, while giving due recognition to the applicability of [federal anti-discrimination laws]." *Id.* at 288. As the court explained, "we are persuaded that the wisest approach when faced with an entity undeniably crucial to the federal monetary system, to which Congress has clearly expressed the intent to grant the broadest possible power and right to dismiss employees, is to limit remedies to those already authorized by Congress." *Id.* Rath-

er than " 'rewrite the relevant provisions of [state anti-discrimination law] to parrot Federal anti-discrimination law,' and 'risk frustrating the intent of the public elected legislature which enacted the [state laws] in the first place,' " *id.* at 290 (quoting *Evans v. Fed. Reserve Bank of Philadelphia,* No. 03 Civ. 4975, 2004 WL 1535772, at *5 (E.D.Pa. July 8, 2004)), the court dismissed the state causes of action as preempted by federal law.

Finally, Judge Dearie of the Eastern District of New York faced this issue in 2005—and then again in 2007 on a motion for reconsideration. In 2005, he briefly noted a circuit split on the FRA's preemptive effect and relied on *Moodie I* to find no "conflict between the [FRA] and state anti-discrimination law." *James v. Fed. Reserve Bank of New York,* No. 01 Civ. 1106, 2005 WL 1889859 (E.D.N.Y. Aug. 8, 2005) *adhered to on reconsideration,* 471 F.Supp.2d 226 (E.D.N.Y.2007) (*"James I "*). On reconsideration, he summarized a number of cases and held that "the NYSHRL is preempted, with regard to the Federal Reserve Bank of New York, only insofar as it exceeds the requirements of Title VII and the ADA." *James v. Fed. Reserve Bank of New York,* 471 F.Supp.2d 226, 236 (E.D.N.Y.2007) (*"James II "*).

### 3. The Preemptive Effect of FRA § 341(Fifth)

The proper interpretation of the FRA's dismiss at pleasure provision is undeniably a difficult question. Some courts have concluded that there is no conflict between the FRA and state anti-discrimination laws because this provision speaks *only* to contractual and other common law rights created under state law. *See Katsiavelos,* 1995 WL 103308, at *2–4; *Mueller,* 797 F.Supp. at 662–63. Other courts have read the provision as a wide-ranging grant of discretionary authority that shields the

Fed from any liability that arises from termination decisions—except as impliedly amended by later-enacted federal anti-discrimination statutes. *See, e.g., Fasano,* 457 F.3d at 288. These courts, in turn, have split over whether state anti-discrimination laws are preempted in their entirety or only to the extent that they sweep more broadly than their federal counterparts. *Compare Arrow,* 358 F.3d at 393 (entirely preempted), *with Kroske,* 432 F.3d at 988–89 (partly preempted), *and James II,* 471 F.Supp.2d at 236 (same); *see also Fasano,* 457 F.3d at 288 (reserving judgment on this issue while noting that "[w]e need not take a position on whether state remedies exactly consonant with the ADA and 12 U.S.C. § 1831j would similarly offend 'the full purposes and objectives of Congress' "). In a dissenting opinion, three Justices of the California Supreme Court have gone even further than the federal courts by strongly suggesting that later-enacted federal anti-discrimination laws did *not* impliedly amend the FRA—in which case the Fed would be immune even from ADA liability. *See Peatros v. Bank of Am. NT & SA,* 22 Cal.4th 147, 185, 91 Cal.Rptr.2d 659, 990 P.2d 539 (2000) (Brown, J., dissenting). In sum, district and appellate courts that have addressed this issue are deeply divided.

▆▆▆ Recognizing this split in judicial authority, and considering both the arguments advanced by the parties and the arguments offered by other courts, this Court concludes that the FRA does *not* preempt state and local anti-discrimination laws. In reaching that conclusion, the Court has considered all three forms of preemption: *express, field,* and *conflict.* None applies here.

### a. Expression Preemption

▆▆▆ The dismiss at pleasure provision does not expressly preempt state anti-dis-

crimination laws. Judicial findings of express preemption are ordinarily reserved for cases in which the disputed federal statute contains an express preemption clause. *See, e.g., Chamber of Commerce of U.S. v. Whiting,* —— U.S. ——, 131 S.Ct. 1968, 1977, 179 L.Ed.2d 1031 (2011); *see also Geier v. Am. Honda Motor Co., Inc.,* 529 U.S. 861, 868, 120 S.Ct. 1913, 146 L.Ed.2d 914 (2000). The FRA contains no such express preemption clause and does not, by its plain terms, speak to state anti-discrimination laws. *See Katsiavelos,* 1995 WL 103308, at *2 ("The right to be free from discrimination is not a contractual right, and therefore is not necessarily embodied in the dismiss at pleasure language." (citations omitted)).

### b. Field Preemption

Turning to field preemption, the Court is persuaded by the Ninth Circuit's reasoning in *Kroske,* which addressed NBA preemption and emphasized the "historic dual regulation of banks by state and federal law." 432 F.3d at 982. As Judge Hart explained in the FRA context:

> It has long been recognized that a state may attempt to affect the conduct of [national] bank officials so long as the exercise of their authority does not conflict with, or frustrate the purposes of federal law or impair the efficiency of banks to perform their statutory duties. In light of this power, Congress' determination to model the federal reserve bank structure after that of the national bank suggests that Congress did not necessarily intend for federal law to occupy the field exclusively.

*Katsiavelos,* 1995 WL 103308, at *3; *see also Kroske,* 432 F.3d at 982–83 (noting that the dismiss at pleasure provision does not participate in a pervasive regulatory scheme and that the NBA simply contains one undefined clause which "does not re-

flect that Congress's clear and manifest purpose was preemption of the entire field of state law"); *Wells Fargo Bank N.A. v. Boutris*, 419 F.3d 949, 963 (9th Cir.2005) ("Since shortly after the Bank Act was enacted in 1864, the Supreme Court has oft reiterated that federal substantive authority over national banks is not exclusive." (internal citation and footnote omitted)).

### c. Conflict Preemption

■■■■ This leaves only the third doctrinal vehicle for federal preemption: conflict preemption, specifically the variant thereof commonly denoted "purposes and objectives" or "obstacle" preemption. *See Sosnowy v. A. Perri Farms, Inc.*, 764 F.Supp.2d 457, 463–64 (E.D.N.Y.2011); *see also Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992) ("In the absence of an express congressional command, state law is preempted if that law actually conflicts with federal law" (citing *Pacific Gas & Elec. Co. v. State Energy Resources Conservation and Development Comm'n*, 461 U.S. 190, 204, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983))). Conflict preemption "occurs when compliance with both state and federal law is impossible, or when the state law stands as an obstacle to the accomplishment and execution of the full purposes and objective of Congress." *United States v. Locke*, 529 U.S. 89, 109, 120 S.Ct. 1135, 146 L.Ed.2d 69 (2000) (internal quotation marks omitted). It rests upon "implied manifestations of congressional intent," *New York SMSA Ltd. P'ship*, 612 F.3d at 104, and obtains where an "irreconcilable conflict" exists such that "compliance with the state statute would frustrate the purposes of the federal scheme," *Pac. Capital Bank, N.A. v. Connecticut*, 542 F.3d 341, 351 (2d Cir.2008) (quoting *Rice v. Norman Williams Co.*, 458 U.S. 654, 659, 102 S.Ct. 3294, 73 L.Ed.2d 1042 (1982)).[6]

■■■■ Conflict preemption accordingly requires courts to specify the "purpose" of the disputed federal statute. To do so here, the Court considers text, history, and precedent.

The dismiss at pleasure provision in the FRA, a law passed in 1913, was lifted directly from the text of the NBA, which dates back to 1864.[7] "This language has remained essentially unchanged, and apparently unexamined by Congress to this day[, but] Congress has left us no record of any discussion of this subsection, or of any specific purpose or motive it might have had in enacting it." M.B.W. Sinclair, *Employment at Pleasure: An Idea Whose Time Has Passed*, 23 U. Tol. L.Rev. 531, 533 (1992). Nonetheless, historical evidence suggests that when the dismiss "at pleasure" provision was drafted in 1864, the term "at pleasure" would have been used interchangeably with "at will." *See* Miriam Jacks Achtenberg, Note, *Rereading the National Bank Act's 'At Pleasure' Provision: Preserving the Civil Rights of Thousands of Bank Employees*, 43 C.R.-C.L.Rev. 165, 172 (2008). It would have been necessary to statutorily specify the "at will" nature of employment relationships in the 1860s because of widespread instability in the background rules governing employment law. *See generally* Jay Feinman, *The Development of the Employment at Will Rule*, 20 Am. J. Legal Hist. 122 (1976).

---

**6.** Field and conflict preemption, both species of implied preemption, "are not rigidly distinct." *Goodspeed Airport LLC v. East Haddam Inland Wetlands & Watercourses Comm'n*, 634 F.3d 206, 209 n. 4 (2d Cir. 2011).

**7.** Courts ordinarily treat the provisions as interchangeable for purposes of preemption.

Given the absence of a regime of employment discrimination statutes in the 1860s and 1910s, the immediate legal and practical result of mandating "at will" employment was quite narrow: "[I]t was a limited effort to deal with a specific problem: the risk that national banks would, either explicitly or by common law implication, contractually restrict their ability to discharge bank officers." Achtenberg, *Rereading the National Bank Act's 'At Pleasure' Provision,* at 172. The NBA and FRA accordingly "trumped any existing state common law presumption that contracts were for fixed annual terms during which employees could only be dismissed for cause" and "forbade national banks from voluntarily entering into fixed-term employment contracts, terminable only for cause." *Id.* at 175. Thus, as numerous courts have recognized, the dismiss at pleasure provision affords the Fed broad latitude to hire and fire—but this "latitude ... was intended in a contractual sense." *Mueller,* 797 F.Supp. at 663; *see also Moodie I,* 831 F.Supp. at 336–37 (noting that Congress "intended the Federal Reserve Banks to be employers at will, conferring no special tenure or contractual rights upon their employees").

By enacting the dismiss at pleasure provision to defeat contractual rights in employment, Congress presumably intended to secure certain policy objectives. Yet it did not clearly define those objectives. Courts and commentators accordingly have examined the broader purpose and structure of the FRA (and NBA) to ascertain legislative intent. The Ninth Circuit thus explained in *Kroske* that "[t]he original congressional intent behind the at-pleasure provision of the Bank Acts was to ensure the financial stability of the banking institutions by affording them the means to discharge employees who were felt to compromise an institution's integrity." 432 F.3d at 983–84 (quoting Kahn & McCarthy, *At–Will Employment in the Banking Industry,* at 215). In slightly more specific terms, Chief Judge Mihm has observed that "[t]he public policy concern ... involve[s] the banking community's ability to remove inefficient, incompetent, or dishonest officers 'at will' without contractual challenges stemming from oral representations, employee handbooks, and ambiguous contractual language." *Mueller,* 797 F.Supp. at 663; *see also* Sinclair, *Employment at Pleasure,* at 533–34 ("Banks profit and prosper by taking care of their customers' money; should those customers lose faith in those who run the bank, they will withdraw that money, the bank's stock in trade, and the bank will cease to prosper.").

Courts frequently look to an 1896 opinion from the Eighth Circuit that addressed the dismiss at pleasure provision, observing in broad terms that the prosperity and success of a bank depend upon the power to remove an officer in whom the public has lost confidence:

> Observation and experience alike teach that it is essential to the safety and prosperity of banking institutions that the active officers, to whose integrity and discretion the moneys and property of the bank and its customers are intrusted, should be subject to immediate removal whenever the suspicion of faithlessness or negligence attaches to them. High credit is indispensable to the success and prosperity of a bank. Without it, customers cannot be induced to deposit their moneys. When it has once been secured, and then declines, those who have deposited demand their cash, the income of the bank dwindles, and often bankruptcy follows. It sometimes happens that, without any justification, a suspicion of dishonesty or carelessness attaches to a cashier or a president of a bank, spreads through the community in

which he lives, scares the depositors, and threatens immediate financial ruin to the institution. In such a case it is necessary to the prosperity and success—to the very existence—of a banking institution that the board of directors should have power to remove such an officer, and to put in his place another, in whom the community has confidence. In our opinion, the provision of the act of congress to which we have referred was inserted, ex industria, to provide for this very contingency.

*Westervelt,* 76 F. at 122. Separate from the merits of its policy views, however, this opinion is not a reliable guide to Congress's intent in 1864. *Westervelt* was decided several decades after Congress passed the NBA, and its discussion of banking policy may have been informed by its markedly different historical context—namely, a prolonged recovery from the Depression of 1893, which was characterized by a financial crisis that disrupted banking throughout the United States and prompted debates over the institutional design of American banks. *See* Achtenberg, *Rereading the National Bank Act's 'At Pleasure' Provision,* at 177; Samuel Rezneck, *Unemployment, Unrest, and Relief in the United States during the Depression of 1893–97,* 61 J. Pol. Econ. 324, 324 (1953). More important, *Westervelt* cited no legislative history to justify its view of legislative intent. *See* Note, *Statutory Provision for Removal of Corporate Officer "At Pleasure",* 50 Harv. L. Rev. 518, 520 (1937) (discussing *Westervelt* and

noting that its policy discussion was "advanced only conjecturally").

■■■ Thus, Congress's apparent purpose in enacting the FRA's dismiss at pleasure was protection of public confidence in the Fed by eliminating a potential threat to that trust—specifically, contractual obligations under state law that could force the Fed to retain corrupt or incompetent employees. From this perspective, the FRA struck surgically against the particular danger presented by a certain kind of limitation on the Fed's employment discretion. The purpose of the FRA's dismiss at pleasure provision, in turn, is defined by that tactical goal.[8]

This interpretation echoes the view of congressional purpose described in *Katsiavelos* and *Mueller,* but parts ways from the broader view articulated in *Fasano* and *Kroske.* Such division is, in many respects, the predictable result of such a difficult interpretive undertaking. To put the point delicately, ascriptions of purpose to statutory language may occasionally prompt disagreement amongst reasonable interpreters. This is particularly true of statutory provisions that courts approach unaided by legislative history and contemporaneous judicial interpretation—favored guides to silent or unclear text. *See, e.g., Ralph Oldsmobile Inc. v. Gen. Motors Corp.,* 99 Civ. 4567, 2000 WL 1459767, at *5 (S.D.N.Y. Sept. 29, 2000) ("Where the text of the statute is silent or unclear on a given issue, a court may look to the legislative history and purpose of the statute."); *United States v. Van Allen,* 28 F.R.D. 329, 343 (S.D.N.Y.1961) ("It is difficult to as-

**8.** Some courts have extended this rule to encompass a broader range of state common law rules sounding in contract and tort. *See, e.g., Mele v. Fed. Reserve Bank of New York,* 359 F.3d 251, 255 (3d Cir.2004) ("While this Court has not previously addressed this particular statute, [c]ourts uniformly hold that [the FRA] precludes the enforcement of any

employment contract against a Federal Reserve Bank and prevents the development of any reasonable expectation of continued employment." (citation omitted) (collecting cases)); *Mackey v. Pioneer Nat'l Bank,* 867 F.2d 520, 525 (9th Cir.1989) ("[T]he National Bank Act raise[s] a defense to both ... contract and tort claims.").

cribe a specific intent to Congress on this issue because it does not seem to have been discussed in the debates on the statutes involved in the present case."). Older laws, like the NBA and FRA, present the further and familiar danger of anachronism—an error cured only by close attention to historical context. *See Goldstein v. California,* 412 U.S. 546, 564, 93 S.Ct. 2303, 37 L.Ed.2d 163 (1973) ("The [1909] Act and the [1909 committee] report should not be read as if they were written today, for to do so would inevitably distort their intended meaning; rather, we must read them against the background of 1909, in which they were written."); Cary Franklin, *Inventing the "Traditional Concept" of Sex Discrimination,* 125 Harv. L. Rev. 1307 (2012) (marshalling historical evidence to argue that judicial interpretation of Title VII's sex discrimination provisions has departed from Congress's intent in 1964 and has imputed later-developed beliefs to an earlier time).

Conflict preemption analysis brings these concerns to the fore. Whereas a predominant trend in interpretive method favors the use of text to discipline far-ranging purposive inquiries, *see* John F. Manning, *Federalism and the Generality Problem in Constitutional Interpretation,* 122 Harv. L. Rev. 2003, 2013–2020 (2009) (discussing the "new textualism"), conflict preemption hinges at its core on a determination of congressional purpose, *see Cipollone,* 505 U.S. at 516, 112 S.Ct. 2608 ("The purpose of Congress is the ultimate touchstone of pre-emption analysis." (quotation marks and citations omitted)). For that reason, among others, Justice Thomas has attacked the doctrine and warned of the potential for ungrounded judicial speculation:

Purposes-and-objectives pre-emption—which by design roams beyond statutory or regulatory text—is [ ] wholly illegitimate. It instructs courts to pre-empt state laws based on judges' conceptions of a policy which Congress has not expressed and which is not plainly to be inferred from the legislation which it has enacted.

*Williamson v. Mazda Motor of Am., Inc.,* —— U.S. ——, 131 S.Ct. 1131, 1142, 179 L.Ed.2d 75 (2011) (Thomas, J., concurring in the judgment) (quotation marks and citations omitted); *see also Wyeth v. Levine,* 555 U.S. 555, 587–88, 129 S.Ct. 1187, 173 L.Ed.2d 51 (2009) (Thomas, J., concurring in the judgment) ("Congressional and agency musings . . . do not satisfy the Art. I, § 7 requirements for enactment of federal law and . . . do not pre-empt state law under the Supremacy Clause."). These weighty concerns offer cause for caution and particularly careful attention to legislative purpose before a finding of conflict preemption.

■■■ A related, equally pernicious difficulty that recurs in conflict preemption cases involves judgments about the appropriate level of generality at which to describe legislative purpose. *See Cipollone,* 505 U.S. at 529–30 n. 27, 112 S.Ct. 2608 (plurality opinion) (noting that "both Justice Blackmun and Justice Scalia challenge the level of generality employed in our analysis" and refusing to read statutes at the highest or lowest level of generality because "our ambition here is not theoretical elegance, but rather a fair understanding of congressional purpose"). Stating a statute's purpose at a high level of generality will ordinarily make a finding of conflict preemption *more* likely by expanding the range of state statutes seen as obstacles, though doing so may occasionally *thwart* a finding of preemption by leading courts to describe a federal law's purposes in such broad terms that an actual conflict with state law is elided or minimized by comparison. The Supreme Court's self-consciously inelegant solution is to seek a

"fair understanding of congressional purpose." *See Altria Group, Inc.,* 555 U.S. at 84, 129 S.Ct. 538 (quoting *Cipollone,* 505 U.S. at 529–30 n. 27, 112 S.Ct. 2608). This resolution is in at least some tension with the rise of textualism, which has led the Court to become "much less of a generality shifter and much more of a generality stickler in matters of statutory interpretation." Manning, *Federalism and the Generality Problem,* at 2020.

Attention to these considerations reveals that the case for FRA preemption of state anti-discrimination statutes relies upon two questionable interpretive moves.

The first move involves an act of acontextual, anachronistic interpretation. The rise of anti-discrimination statutes as a feature of American employment and civil rights law wrought a dramatic transformation of the preexisting legal and political paradigm. *See Price Waterhouse v. Hopkins,* 490 U.S. 228, 239, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (explaining that, when it passed Title VII, "Congress made the simple but momentous announcement that sex, race, religion, and national origin are not relevant to the selection, evaluation, or compensation of employees"); *see also Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (describing "Title VII's broad rule of workplace equality"). This sort of systemic statutory regime, designed to promote equality of opportunity in the American workforce, was in many respects inconceivable to the drafters of the NBA in 1864— and even the drafters of the FRA in 1913, a historical moment marked by early attempts at progressive social regulation that hardly even prototyped comprehensive laws like Title VII and the ADA. Further, to the extent that legislators in 1913 may have been familiar with demands for a certain form of equality of opportunity based on race and gender, the very

notion of "disability" as a classification suitable for legal protection in the workplace would have seemed positively foreign. *See* Robert L. Burgdorf Jr., *The Americans with Disabilities Act: Analysis and Implications of A Second–Generation Civil Rights Statute,* 26 Harv. C.R.-C.L. L.Rev. 413, 426 (1991) ("Efforts to pass laws banning discrimination on the basis of disability represent a shift in society's conception of its responsibilities to people with disabilities—a shift from charity to civil rights."). Indeed, the "disability rights" movement coalesced only in the late twentieth century and passage of the ADA was understood as a paradigm-altering event. *See* 136 Cong. Rec. S9689 (daily ed. July 13, 1990) (statement of Sen. Harkin) ("The ADA is . . . the 20th century emancipation proclamation for all persons with disabilities."); Samuel R. Bagenstos, *The Future of Disability Law,* 114 Yale L.J. 1, 3 (2004) ("[The ADA] represented our society's first comprehensive acknowledgment that people with disabilities are truly equal citizens, fully entitled to participate in all areas of political, economic, and civic life.").

For these reasons, it is implausible to conclude that the drafters of the FRA could have possessed any sort of "intent" whatsoever with respect to preemption of state (or federal) anti-discrimination laws, particularly those addressing the rights of people with disabilities. *See Katsiavelos,* 1995 WL 103308, at *4 (observing that "the Congress of 1913 could not have contemplated the tremendous rise of state and federal discrimination laws"). Likewise, in a time before the sorts of cooperative federalism schemes that we now accept as commonplace and that are exemplified by the modern state/federal anti-discrimination regime, Congress could not have "intended" anything with respect to the role (or lack thereof) of state versus federal anti-discrimination laws vis-à-vis an entity

like the Fed. *See id.* (observing that Congress could not have "foreseen the economic need for the joint state/federal enforcement scheme of Title VII and related discrimination laws"). This conclusion reflects the general point that authors, including Congress, simply cannot possess "intentions" or express "meaning" with respect to concepts or institutions unavailable in their lived historical moment.[9]

Thus, Congress's intent regarding a prohibition on contractual obligations in the pre-Title VII world of at-will employment, a world devoid of cooperative federalism schemes and the very idea of a regime designed to secure economic opportunity for certain protected groups, simply does not translate into the sort of "intent" necessary to a finding of conflict preemption here. Only by anachronistically imputing to the Congress of 1913 a set of intentions about a legal regime that did not exist in the early twentieth century, and could not have been imagined at the time, could the Court locate a "purpose" frustrated by modern state laws. The Court declines to engage in such an adventurous approach to ascertaining legislative intent for purposes of conflict preemption. The FRA manifests intent only with respect to contractual and other common law obligations of the sort that would have defeated at-will employment as it was understood in the early twentieth century. It is silent regarding employment discrimination statutes.

Nonetheless, some courts have relied upon a second interpretive fallacy to find conflict preemption under the FRA: specifically, description of legislative purpose at an unsuitably high level of generality. Without any citations to the legislative record or contemporaneous legal materials, these courts have referred sweepingly to "Congress's intent to provide Federal Reserve Banks with the broadest possible latitude in carrying out their statutory duties," finding that "Congress has clearly expressed the intent to grant the broadest possible power and right to dismiss employees." *Fasano*, 457 F.3d at 288; *see also Kroske*, 432 F.3d at 983–84. On this view, *any* state or federal legal rule that burdens the Fed's limitless discretion apparently runs afoul of the FRA's vast mandate. This position would require denial of even *federal* anti-discrimination protections to the Fed's employees—but for creative judicial rewriting of the FRA through the mightily disfavored doctrine of implied repeal. *See Fasano*, 457 F.3d at 284, 288; *Kroske*, 432 F.3d at 987; *James II*, 471 F.Supp.2d at 236. Some courts go

---

**9.** This point has most famously been defended and explained by Professor Quentin Skinner. He helpfully relies upon an example drawn from legal history:

> Consider the debate about whether some of the English legal theorists of the seventeenth-century may be said to have intended to articulate a doctrine of the judicial review of statute. I am arguing in effect that these writers will have been limited, in their intentions in writing, by the range of intentions they could have expected to be able to communicate, and thus by whatever stock of concepts, and whatever criteria for applying them, were generally available. It follows that the question whether the seventeenth-century lawyers were adumbrating a doctrine which was later to become politically important, or whether there is merely a random similarity of terminology, may be settled by settling the question whether the concept of judicial review was a part of the stock of concepts available, in its later and popularised sense, to the audiences for whom the seventeenth-century lawyers were writing. If it was not (as I believe can be shown to be the case) then the question loses virtually any meaning, to say nothing of plausibility.

Quentin Skinner, *Motives, Intentions, and the Interpretation of Texts*, 3 New Literary Hist. 393, 406–07 (1972); *see generally* Quentin Skinner, *Meaning and Understanding in the History of Ideas*, 8 Hist. & Theory 3 (1969).

further and effectively rewrite state anti-discrimination laws. *See, e.g., James II*, 471 F.Supp.2d at 236–37.

Level of generality debates are notoriously difficult and often require courts to draw upon resources both internal and external to the disputed object of analysis. *See generally* Laurence H. Tribe & Michael C. Dorf, *Levels of Generality in the Definition of Rights*, 57 U. Chi. L. Rev. 1057 (1990). This remains true where the task involves historical analysis. *See id.* at 1087–88 ("To acknowledge the manipulability of historical traditions is to recognize that all history is summary. The lens of the historical camera, in focusing on one event, necessarily blurs others ... Moreover, historical traditions, like rights themselves, exist at various levels of generality."). Here, the Court draws upon the statutory language, the historical record, and preemption doctrine to demonstrate that reading the FRA at a high enough level of generality to require preemption of state anti-discrimination laws is ill-founded for two related reasons.

▮ The first reason is that this statutory language does not comfortably bear such an abstract reading. In relevant part, the FRA empowers the Fed "to appoint by its board of directors a president, vice presidents, and such officers and employees as are not otherwise provided for in this chapter, to define their duties, require bonds for them and fix the penalty thereof, and to dismiss at pleasure such officers or employees." The FRA's at pleasure provision applies to the *dismissal* of employees, but goes no further. In other words, it does *not* extend beyond the principal purpose of the at-will employment doctrine: to authorize an employer to dismiss an employee without cause. *See Lauture v. Int'l Bus. Machines Corp.*, 216 F.3d 258, 263 (2d Cir.2000) (noting that an "at-will employee can be fired for good

cause, bad cause, or no cause at all" (citing *Fadeyi v. Planned Parenthood Ass'n of Lubbock, Inc.*, 160 F.3d 1048, 1051–52 (5th Cir.1998))). Anti-discrimination laws, in contrast, apply to the terms and conditions of the entire employment relationship—extending far beyond dismissal to encompass hiring, pay, promotion, benefits, as well as other terms and conditions of employment. *See Islamic Soc'y of Fire Dept. Pers. v. City of New York*, 205 F.Supp.2d 75, 83 (E.D.N.Y.2002) (noting that, in the Second Circuit, "an adverse employment action is a 'materially adverse change in the terms and conditions of employment.'" (citation omitted)).

This incongruity is revealing. The FRA assures that the Fed can *dismiss* its employees unhindered by contractual limitations, but does not expressly grant the Fed complete control over all aspects of its employment decisions. In contrast, state anti-discrimination laws aim not at a for-cause regime, but at prohibiting one kind of employer misconduct—discrimination on the basis of protected characteristics—in *all* aspects of the employment relationship.

The FRA's under-inclusiveness accordingly weighs against the view that Congress sought to confer virtually unfettered discretion, sufficient to defeat even later-enacted anti-discrimination laws, because Congress spoke only to employer control over *dismissal*.

Indeed, against the modern background of anti-discrimination laws, it would be passing strange if the FRA were interpreted to *permit* liability for employment discrimination that did not result in termination, but to *prohibit* liability for brazenly firing an employee on the basis of his race. Yet the FRA speaks only to termination decisions, not to hiring choices and treatment in the workplace environment. Assuming an unwillingness to accept the absurd view that the FRA prohibits blatant

racial discrimination only until the very moment of termination, the interpretive choice is stark: read the FRA's "dismiss at pleasure" provision as a vast shield against *all* employment liability, thereby reaching new heights of generality in defining statutory purpose, or adhere to the view that an early twentieth century Congress spoke only to common law bases of liability.[10]

Admittedly, this argument for interpreting Congress's purposes and objectives at a lower level of generality is not dispositive. The Supreme Court has acknowledged in the context of presidential removal powers that control over termination decisions is critical to employer authority throughout the employer-employee relationship. *See, e.g., Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.,* —— U.S. ——, 130 S.Ct. 3138, 177 L.Ed.2d 706 (2010); *Humphrey's Ex'r v. United States,* 295 U.S. 602, 55 S.Ct. 869, 79 L.Ed. 1611 (1935); *Myers v. United States,* 272 U.S. 52, 47 S.Ct. 21, 71 L.Ed. 160 (1926). By analogy, one might argue that in a world devoid of any other limits on an employer's power to fire employees, a law that barred *only* common law claims functionally implicated employer control over every aspect of the employment relationship. On that view, one might conclude that the Congress of 1913, taking stock of available bases for liability at the time, intended to create the functional equivalent of complete immunity in the employment context—and did so through the "at pleasure" language, which sufficed to achieve its purpose.

Yet even if the presence of under-inclusiveness does not control, it certainly tips the scales. The Fed's view requires the Court to read the FRA at a *very* high level of generality—and then to indulge the anachronistic assumption that Congress further intended to extend this free-floating discretion over an as-yet-unknown category of laws. No legislative history or contemporaneous judicial rulings support that view. The text, our lonely guide to intent, speaks only of dismissal. Rather than build a mountain atop this slender reed, the Court concludes that the statutory text most naturally accords with a more modest vision of Congress's intent.[11]

The foregoing argument offers one ground to favor a lower level of generality; the Court locates a second basis in the Supreme Court's well-established presumption against preemption. As the Supreme Court has repeatedly emphasized: "[W]e start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the *clear and manifest purpose of Congress.*" *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947) (citations omitted) (emphasis added). The main virtue of

---

**10.** The Fed has impliedly conceded the breadth of its argument by referring to the need to protect its "day-to-day employment decisions"—not merely its dismissal decisions. (Dkt. No. 13, Mem. of Law in Supp. of Def.'s Mot. to Dismiss Pl.'s Am. Compl., at 14.)

**11.** The Fed also refers in its brief to a general legislative interest in creating uniformity for the Fed, an interest allegedly imperiled by diverse state and local anti-discrimination provisions. (Dkt. No. 13, Mem. of Law in Supp. of Def.'s Mot. to Dismiss Pl.'s Am. Compl., at 14–15.) No court has concluded that this highly generalized interest in uniformity constitutes a "purpose or objective" that conflicts with state law—even those courts that have otherwise found complete or partial preemption of state anti-discrimination schemes. The Court similarly declines to view the uniformity objectives behind the FRA as a "purpose" of the federal law that creates conflict preemption; a great many federal laws seek uniformity, but not all of them impliedly preempt any competing state law.

the presumption in this context is that it affords an independent basis to choose between competing levels of generality.

The Court cannot conclude that Congress revealed in the FRA a "clear and manifest" purpose to endow the Fed with unlimited discretion in its employment practices, even as against later-enacted anti-discrimination laws. To the contrary, given the presence of multiple, plausible interpretations of legislative purpose, as well as reasonable judicial division on this point, the presumption against preemption adds another thumb to the scale. More precisely, in the context of conflict preemption, where ordinary interpretation of legislative intent yields two results that are both plausible and that stand close to equipoise, the presumption against preemption provides an independent basis for adopting the interpretation that would avoid preemption. *Cf. Williamson*, 131 S.Ct. at 1142 (Thomas, J., concurring in the judgment).

### 4. Conclusion: FRA § 341(Fifth) Does Not Preempt Plaintiff's City and State Law Claims

■■■ The Court holds that the FRA does not preempt state and local anti-discrimination statutes because Congress did not manifest an intent to create a federal scheme whose purposes would be frustrated by the enforcement of those laws. Specifically, the Court concludes that only a misdescription of Congress's purposes and objectives in 1913 would support a finding of preemption. Congress sought only to protect public confidence in the Fed to the extent that eliminating state law contractual obligations would achieve that end. It manifested no intent whatsoever toward anti-discrimination statutes. *See Katsiavelos*, 1995 WL 103308, at *2 ("The right to be free from discrimination is not a contractual right, and therefore is not necessarily embodied in the dismiss at

pleasure language." (citing *Moodie*, 831 F.Supp. at 336–37; *Mueller*, 797 F.Supp. at 663)). And it would not constitute a "fair understanding" to read Congress's handiwork at the level of generality necessary to identify a conflict between state and federal law. *See Cipollone*, 505 U.S. at 529–30 n. 27, 112 S.Ct. 2608 (plurality opinion). Finally, the Court concludes that there is no conflict between state anti-discrimination laws and the purposes and objectives of the FRA's dismiss at pleasure provision. Under preemption doctrine, the Supremacy Clause does not imperil the state and local anti-discrimination laws recited in Plaintiff's complaint.

### 5. Federal Instrumentality Analysis

In the memorandum of law supporting its motion to dismiss, the Fed raises a number of considerations associated with federal instrumentality jurisprudence, but does not squarely claim federal instrumentality status or argue that such status requires preemption of state and local anti-discrimination laws. In its reply brief, however, the Fed squarely invokes federal instrumentality doctrine. It is a close question whether the Fed validly raised this issue in its motion to dismiss or waived it by waiting until its reply brief to claim instrumentality status. To be thorough, the Court nonetheless addresses the Fed's status as a federal instrumentality.

■■■ In sum, the Court finds persuasive Judge Dearie's analysis in *James II*. *See generally* 471 F.Supp.2d at 237–43. Judge Dearie concluded that the Fed is a federal instrumentality "for purposes of a state law aimed at preventing discrimination in employment," but then held that it is not "immune from regulation by a state fair employment practices agency." *Id.* at 238. The Court agrees with both prongs of this analysis, notably including Judge Dearie's observation that "federal instru-

mentalities are not immune from state regulation in every case." *Id.* at 240.[12] The relevant test is whether state laws will "interfere with the New York Fed's performance of its federal function." *Id.* at 243. Because Judge Dearie held that state laws are preempted to the extent they sweep beyond their federal counterparts, he concluded that enforcement of state law would not interfere with the Fed any more than already-applicable federal law. *Id.*

 Here, in contrast, the Court has concluded that state and local employment laws are not preempted by federal law and thus operate to their fullest extent. This holding, however, does not alter the outcome of the Court's instrumentality analysis. The state and local laws presently at issue do not extend so far beyond their federal counterparts as to generate an interference with the Fed's federal function sufficient to justify preemption.[13]

### IV. Conclusion

For the foregoing reasons, Defendant's motion to dismiss is DENIED.

The Clerk of Court is directed to close the motions at Dkt. Nos. 6 and 12.

SO ORDERED.

---

12. Thus, Judge Engelmayer's persuasive analysis of the Fed's federal instrumentality status in the recent case of *Starr Int'l Co. v. Fed. Reserve Bank of New York* does not answer the question here, since *Starr Int'l Co.* dealt with a markedly different—and significantly more essential—federal function. *See* 906 F.Supp.2d 202, 232, No. 11 Civ. 8422, 2012 WL 5834852, at *26 (S.D.N.Y. Nov. 16, 2012) ("In light of its powers, characteristics, and central role in the national banking system, a Federal Reserve Bank is a federal instrumentality.").

13. Many of the provisions identified by the Fed as broader than federal law do not appear to be implicated by this case, including the state law definition of disability and the circumstances under which an employer is obliged to make a reasonable accommodation. Although the damages provision, as well as some other provisions, may be implicated here, these provisions—taken collectively—do not pose so significant an obstacle to the Fed's performance of its federal function that instrumentality jurisprudence requires preemption.